Thomson, J.,
delivered the opinion of the court.
On May 18, 1889, W. E. Sweet contracted with Wimbush & Powell to construct for them fifteen houses and one stable upon lots situated in Berkley, for which they were to pay him $39,506. Afterwards, on September 28, 1889, the parties entered into a supplemental agreement concerning the same subject-matter as follows r
“This agreement, made between William E. Sweet of the first part and Henry A. Wimbush and Arthur W. Powell, partners under the firm name of Wimbush & Powell, of the second part, supplemental to their agreement dated May 18, 1889, witnesseth:
“ In order to provide an assurance to the second party against mechanics’ liens it is agreed that the first party at the time of receiving payment upon any building shall procure and deliver to the second party a waiver by the material and labor men of théir lien and all right to lien thereon except as to laborers or mechanics working by the piece or by the day, and as to them he will exhibit his book showing the payment *543 of wages. As a further assurance it is agreed that the $5,000 last falling due under said agreement of May 18th, shall, when due, be paid over to The Denver National Bank as an escrow to be held until the time provided by the law for filing liens by subcontractors of all degrees shall have expired. At the end of said period the samé shall be paid over by said bank to the said party of the first part, unless there shall at that time be pending and unsettled mechanics’ liens against one or more of the buildings mentioned in said agreement. In case there shall be such unsettled liens, said Denver National Bank shall retain the amount of all such liens and fifty per cent additional from said $5,000 and pay over the remainder to said Sweet and the moneys so retained by said check shall be paid over to said Sweet as such lien and liens are settled and discharged.”
On July 5, 1889, Sweet borrowed from The Union Bank of Denver $4,000, and on August 2, 1889, $2,000, to be used in the construction of the buildings, for each of which sums, at the time of receiving it, he made his note to the bank, due in ninety days, with interest from date at ten per cent. On October 17, 1889, there had been paid on these notes sums aggregating $2,104.44. On November 7, 1889, for the purpose of securing the balance due, Sweet executed to the bank the following instrument:
“ Whereas, I am indebted to The Union Bank of Denver, upon two promissory notes, both past due, to the amount of four thousand dollars, with interest, and desire to secure the payment thereof; Now I, William E. Sweet, hereby sell, assign, transfer and set over to said Union Bank five thousand dollars, which is to become due to me from Wimbush & Powell, under my building contract with them, dated May 18, 1889, and set aside as an escrow to be held and paid out by the Denver National Bank pursuant to my supplemental agreement with said Wimbush & Powell, dated September 28, 1889, and this shall be taken and considered as my order to said Wimbush & Powell and to the Denver *544 National Bank to pay over the said moneys when payable, according to the terms of said supplemental agreement,, to the said Union Bank.
Wk. E. Sweet. ” -
On November 11, 1889, Sweet’s health having failed, so that he was unable to give his personal, attention to the-work, he entered into an agreement with The Sayre-Newton' Lumber Company, by the terms of which he turned over to' the Lumber Company for completion, certain uncompleted contracts, among which was that with Wimbush & Powell ; the company to control and manage the work, collect the moneys due, and to become due, on account of it, and .disburse the' same in payment for such material and labor as' had been furnished,, and might be. necessary for the comple-' tion of the contracts, including the payment of Sweet’s notes to the Union Bank. ■ . •
Wimbush & Powell had. some kind of an agreement with The Denver Land and Security. Company, whereby it was to advance the money for the erection.of these buildings,; and the money which was.to.be paid into the Denver National Bank, in pursuance of the .supplemental agreement between Sweet and Wimbush .&..Pow.ell, was to be retained and held by the Security Company. ' It is not very material what the arrangement was by which this company became the custodian of the $5,000 instead of the bank, because it is entirely Clear that it was, the same fund which was'assigned by Sweet to the Union Bank.. .
On the 17th day of January,. 1890, The. Sayre-Newton Lumber Company filed in the office of the .recorder of Arapahoe county two mechanic’s, lien statements, one against lots 12, 13 and 14, block 36, and the other against lots 12,. 13 and.14, block 8, both in .Berkley,, and upon which two of the houses provided for in Sweet’s contract-with Wimbush & Powell were erected. On the 20th. day of January, 1890, The Hallack Paint, Oil and Glass Company filed in. the same office its mechanic’s lien.statement against the fifteen, tracts,, upóp .which were the.fifteen' houseslmentioned in the. *545 contract. On the 3d day of February, 1890, The West Side Planing Mill Company filed its lien statement against two of these tracts. The claim of this company was subsequently assigned to The Hallack Paint, Oil and Glass Company.
On the 8th of February, 1890, The Union Bank of Denver filed its complaint against Wimbush & Powell, and The Denver Land and Security Company, praying for a decree that the amount due upon Sweet’s notes be paid to it out of the $5,000 which had been assigned to it, and which was in the hands of the Security Company. The Sayre-Newtou Lumber Company, The Hallack Paint, Oil and Glass Company, The West Side Planing Mill Company, and other lien claimants, were made parties defendant to the proceeding. The Sayre-Newtou Lumber Company answered the complaint. The Paint, Oil and Glass Company and the Planing Mill Company joined in a cross complaint setting forth their respective lien claims, alleging the assignment by the latter company of its claim to the former, and praying appropriate relief. The other lieu claimants filed answers and cross complaints.
On the 7th day of March, 1890, The Sayre-Newtou Lim her Company commenced original proceedings for the enforcement of its'liens, in which answers and cross complaints were filed by the various parties defendant.
AH these several causes were united, and the consolidated case was, pursuant to a stipulation among 'the parties, referred to E. P. Harman, .Esq., to try the issues of fact and law, and report a finding and judgment. A trial was accordinglj' had, and, from the evidence adduced, the referee found that there was due from Wimbush & Powell $41.50, and from The Denver Land and Security Company $5,000; that The Sayre-Newtou Lumber Company was not entitled to a mechanic’s lien on either of the tracts embraced in its statement ; and that neither The West Side Planing Mill Company nor The Hallack Paint, Oil and Glass Company wax *546 entitled to a mechanic’s lien. The referee also found that none of the other claimants was entitled to a lien.
The referee’s judgment was that the $5,000 and the $41.50 be paid into court, out of which should be paid the costs of reference, the amount due the Union Bank and its costs, and the costs of The Denver Land and Security Company ; that the lien claimants pay the costs incurred by them respectivety, and that The Sayre-Newton Lumber Company pay the residue of the costs. The judgment of the referee was made the judgment of the court. From this judgment The Sayre-Newton Lumber Company and The Hallaek Paint, Oil and Glass Company have prosecuted error to this court.
The first objection which is made goes to the judgment in favor of the Union Bank. The source from which this objection comes precludes its consideration. The fund out of which the bank’s claim was adjudged was set apart for the protection of Wimbush & Powell, against a possible default of Sweet in the discharge of his obligation to material men and laborers, the consequence of which might be the incumbrance of the buildings and grounds with mechanics’ liens. The agreement for the withholding of this money was .made after an amendment to the mechanic’s lien law, which we shall notice again, had gone into effect, and which provided that payments made by the owner to the principal contractor before the expiration of the time within which subcontractors might file their liens, should be at his own risk, and should not be a set-off against the claim of a subcontractor who might perfect .a lien in compliance with the act. By the terms of the agreement, if, when the time had elapsed, no liens were on file, Sweet was entitled to the money. If liens were then on file, Sweet was entitled only .to .any surplus which might remain after deducting the .amount of the liens, and fifty per cent in addition. The intention of the parties to the agreement appears upon its face. It-was- to save Wimbush & Powell harmless,■■ in case .any failure of Sweet, in his payments, shoúld result 'hr mechanics’ liens upon their property. The lien claimants had *547 •no interest in this fund; Their rights were fixed-by the , statute, and that provides but one kind of lien, available to them, and but one manner of enforcing it. The lien is .against the real estate, aud it is enforced by a sale of the real estate. There is no way by which a party, in a proceeding to enforce a mechanic’s lien, can reach a fund; his sole . remedy is against the property. The assignment to the bank was, except as to Wimbush & Powell, an absolute transfer of the fund. It was subject to a right in them to apply the money in discharge of mechanics’ liens, but it was subject to . nothing else. If the fund was improperly subjected to the payment of the debt due the bank, Wimbush & Powell were the only parties having the right to complain; and, as they are not complaining, we cannot inquire into the judgment.
The ruling of the referee, in rejecting the several mechanics’ liens of the plaintiffs in error, is next assailed. The two liens of The Sayre-Newton Lumber- Companji- will be first looked into. On April 18, 1889, the mechanic’s lien law of 1883 was in force. Gen. Stats., 1883, p. 662. On that day an act of the legislature, amending this law, was' approved, and went into effect ninety days later. Session Laws, 1889, p. 247. . .
It made important changes in the law as it then stood. . It repealed all acts and parts of acts in conflict with it, but provided that it should not be construed to affect existing rights. The law of 1883 was available for the purpose of protecting rights which had accrued prior to the taking effect of the act of 1889, but rights subsequently acquired could be preserved and enforced only in conformity with the provisions of the new law. By the law as amended, whoever should do work, or furnish materials, for the construction of an improvement upon land, by contract with the owner, or with the principal contractor or a contractor under him, was entitled to a lien.
The evidence showed that there had been paid to Sweet, before he relinquished the contract, about $17,000, and to the Lumber Company, after it took charge, $17,211.34; and *548 that the total amount of its disbursements on account of material and labor was §13,955.70, leaving an overplus in its hands of §3,255.64, out of which, however, it was entitled to §2,905.79, on account of material furnished in the construction of four of the houses, including the two against which it asserted liens. But after making this deduction it still had §349.85 more than was due. Upon the face of these figures the claims for which the liens were filed had been fully paid, and there was nothing to support a lien.
The argument by which it is sought to avoid this conclusion is deserving of notice. It is in effect as follows: The agreement between the Lumber Company and Sweet, in pursuance of which it completed the contract, constituted it Sweet’s agent. By contract with Sweet, or with itself as Sweet’s agent, it had furnished material for the construction of the buildings. It was therefore acting in the double capacity of agent for Sweet, and contractor under him. As Sweet’s agent it collected the money from Wimbush & Powell, and paid for labor, and material elsewhere obtained ; and as Sweet’s agent settled with itself as subcontractor, and paid itself out of the money collected. It had contracts with Sweet to furnish material for buildings other than those in which Wimbush & Powell were interested, and upon which Sweet owed it money; and it collected from itself, as Sweet’s agent, the money which had been received from Wimbush & Powell upon their contract, and paid it to itself upon these other contracts, leaving its claims against the four houses of Wimbush & Powell undischarged. It would have the right to collect the money due upon these outside contracts from Sweet himself, notwithstanding he received it from Wimbush & Powell; and, as it was Sweet’s agent, and stood in his shoes, it had the same right to collect the money from itself, and apply it in the same way, without reference to the source from which it was derived. The reason why it was entirely regular and proper to proceed in this way, is given thus: “ Under the lien statute the owner pays the contractor at his peril, for where the money passes into the *549 contractor’s hands, it is his. If honest he will pay his subcontractors. If he don’t the owner must still settle with them, for he took this risk under the law when he paid him contrary to the statute. * * * The rights of this Lumber Company were very different as his agent under the assignment, from its rights as a subcontractor. Any money coming into its hands as agent must be disbursed by it as he directed. The proof shows that the company did receive from the Berkley contract the sum of $8,255.64 in excess of disbursments on same contracts, but it is shown too that Sweet, being indebted to it on the other six contracts, directed it to apply said excess as a credit on the amount owed by him to the company under the other contracts. By this application, which he certainly had a right to make of his own money, the Lumber Company was not paid the sum of $2,905.17, due on four of said houses.”
Whatever we may think of this argument as an exposition of the law, it is certainly lucid enough. We can readily see how it was that Wimbush & Powell, although they fully paid for all material used in these houses, received no credit for their payments, but were subjected to proceed to compel them to pay the amount over again.
The assumption of speeial directions from Sweet is not sustained by the evidence. Without inquiring how closely a court of equity will scrutinize a transaction between a party as principal and himself as agent, where the rights of others are involved, and considering this as if it had taken place between Sweet himself and the company, we shall proceed to inquire what foundation there is in the statute for its claims. It is plain from counsel’s language that lie takes it for granted that whatever rights the Lumber Company had were governed by the amendatory act of 1889. He assumes, as a proposition which is not subject to question, that Wimbush & Powell paid the principal contractor, Sweet, or his agent, the Lumber Company, at their own peril; and that, when they did so, they took the risk of being compelled to pay the money again at the suit of some unpaid subcon *550 tractor. This idea is evidently derived from the amendment of 1889. The law of 1888 is otherwise. It is not clear from the evidence whether these lien claims should have been asserted under the amendatory or the amended act; but'it is entirely certain that the statements before us do not conform to the requirements of the former. By the terms of the act of 1889, the lien statement must set forth the name or names of the owner or owners of the property. Compliance with this, as with any other requirement of the law, is essential. Without it there is no lien. Neither of these statements contains, or purports to contain, the names of the owners of the property. The amendment also provides that in order to preserve a lien for work performed, or materials furnished, by a subcontractor, there must be served upon the owner of the property, his agent or trustee, at or before the time of filing the statement with the recorder, a copy of sucli statement; or, if neither the owner nor an agent can be found in the county,' an affidavit to that effect must be filed with, the statement. There is no allegation or pretense that any! thing of that kind was done in this case. The act of 1889 was therefore not complied with in the making of these statements ; and if, as counsel seems to understand, the rights of the Lumber Company were governed by that act, the statements are worthless, and no lien was acquired by them. In ■form, however, they are in substantial conformity with the provisions of the act of 1883; and, if the rights of the Lumber Company accrued in time to entitle it to avail itself of that act,- it is by its terms that the relief to which the company is entitled must 'be measured. That law expressly provided that claims of subcontractors should not, in any event, be a lien upon the property, to any greater extent than the indebtedness of the owner to the contractor: Therefore^ whatever the owner might, in good faith, pay to the contractor, he was entitled to credit for as against any subcoiL tractor who might afterwards assert a lien. The money paid could not be diverted into some other channel to the prejudice of the owner. When the Lumber Company, as the agent of *551 Sweet, received full payment from Wimbush & Powell for all the material furnished to' their buildings, they were to that extent discharged from liability; and if it used the money received in payment of an indebtedness from Sweet to it on account of other buildings, and thereby lost its right to liens upon them, it must take the consequences.
The evidence showed that Wimbush & Powell had paid the full contract price for the construction of their buildings, unless it might be the sum of $11.50. What this debt arose out of, whether it was part of the originally agreed amount, or was incurred on account of something not provided for by the contract, is not clear. In the assignment of error's, and in the argument, it seems to be conceded that the contract price was fully paid; the right of the Lumber Company to a judgment is throughout based upon grounds entirely different from any failure of Wimbush & Powell to pay the contractor; and no objection is anywhere suggested to the disposition made of the $11.50 by the referee. We shall therefore treat the case as the parties have treated it; and, concluding with them, that there was no indebtedness from Wimbush & Powell to the contractor, by virtue of the contract, we are bound to hold that, pursuant to the provisions' of the law of 1883, the Lumber Company was not entitled to a lien ; and, being entitled to none under the act of 1889, the decision of the referee must be upheld.
The lien statement of The Hallack Paint, Oil and. Class Company is void upon its face. It sets forth that the lien is claimed on account of material furnished for the buildings on the ground it describes, at the request of Hoffman & M-illis, subcontractors. It also states that Hoffman & Millis’ contract was with William T. Straughn, who was a contractor under Sweet, the principal contractor. The grade of the Paint Company’s contract was, therefore, three removes from the principal contract. The statute provides- for the acquiring of mechanics’ liens by three classes of persons: First, the-original contractor;. second, the contractor under him; third, the contractor with the.sub *552 contractor. The contractor with the principal contractor is designated as a subcontractor in the first degree, and the contractor with this subcontractor is a subcontractor in the second degree. The statute allows a lien in favor of a subcontractor in either of these degrees, but there it stops. The subcontractor in the second degree is at the bottom of the descending scale. A mechanic’s lien is a creation of the statute. Without a statute there is none; and those persons only, in whose favor the right to liens is given, can acquire them. As shown by this lien statement, the principal contractor was Sweet, the subcontractor in the first degree was Straughn, and the subcontractors in the second degree were Hoffman & Millis. The Paint Company was a grade lower. It was just mm grade below the last grade in which the law allows a mechanic’s lien. At the hearing, counsel for the Paint Company asked leave to amend its cross complaint, so as to make it appear that the company was the owner of the claim as assignee of Hoffman & Millis, and not as contractor with them. This leave was refused, and error is assigned upon the refusal. Amendments of pleadings to conform to the proofs are permissible, after the evidence is heard, upon a proper showing made; but the amendment asked here, instead of conforming the cross complaint to the proofs, would have directly contradicted them. It would have contradicted the lien statements, and it would have contradicted the witnesses.
The sworn testimony was that Hoffman & Millis had a contract with Straughn to paint the houses, and that they procured the painting material from The Hallaek Paint, Oil and Glass Company. Furthermore, the only claim which Hoffman & Millis could have had was a claim for the work of applying the paint to the buildings; and an amendment showing the assignment of that claim would have been the introduction into the cross complaint of a matter entirely foreign to the cross complainant’s case. There are other objections to this lien statement, — notably one that it embraces fifteen distinct and entirely separate tracts of land, — but as *553 it was invalid for the reason stated, it is unnecessary to discuss it further.
The West Side Planing Mill Company also' undertook to cover distinct tracts with one lien; but we shall place our disposition of that lien upon other obvious grounds. Waiving certain defects in the cross complaint, by reason of which there was a failure to state a cause of action, there was no proof that any of the material alleged to have been sold was used in the houses built upon the land covered by the lien, or in either of them. The material was sold for fifteen houses, and the amount charged against the houses in question was simply the unpaid balance of the entire bill. Where the material sold was actually used was not shown. It does not appear that any of it went into these particular houses. The company reléased its right of lien upon all the houses except these; and, for all that was shown, the houses released were the only ones against which a lien could have been asserted. No right whatever to this lien was made to appear.
The only remaining question arises upon the disposition made of the costs. The costs of The Denver Land and Security Company, Wimbush & Powell, The Union Bank, and the costs of reference, were adjudged to be paid out of the $5,041.50 deposited in court. There was judgment against the several lien claimants for the costs incurred by them, and against The Sayre-Newton Lumber Company for all the residue. The latter company complains of this judgment. The only residue was the cost occasioned by the company’s resistance to the action of the bank, and its proceeding to enforce its mechanics’ liens, in both of which judgment went against it, and the costs, of course, followed the judgment. There is no error discoverable in the proceedings below, and the judgment will be affirmed.

Affirmed.