16 So.2d 100

**SECURITY FEDERAL SAVINGS & LOAN ASS'N v. UNDERWOOD COAL & SUPPLY CO.**

**i Div. 203.**

Supreme Court of Alabama.

Dec. 16, 1943.

Robt. H. Smith, of Mobile, for appellant.

58

Wm. G. Caffey, of Mobile, for appellee.

FOSTER, Justice.

The question on this appeal relates to the claim of appellee, Underwood, as a materialman furnishing building material to a contractor "Better Homes." He is suing to fix a trust for his benefit on a fund loaned by appellant, Security Federal Savings & Loan Association, to the owner Thompson, with a stipulation to pay it to the contractor in installments at certain designated stages of the work. The amounts were paid to the contractor but he did not pay for this material, and no lien was created by a compliance with the statute.

A case involving a similar situation was here on appeal in Emanuel v. Underwood Coal & Supply Co., Ala.Sup., 14 So.2d 151,[1] there seeking to establish an equitable lien on the property in the nature of a mechanic's lien. When it was held that he had no such standing he amended his bill in the instant case, alleging that the arrangement was that appellant should require the furnishing of paid bills for labor and materials for said jobs or affidavits that such bills had been paid before disbursing or paying out the moneys loaned by it, and upon that understanding Underwood relied and acted to his prejudice; and that the money in the hands of Security Federal was a trust fund to be used for the primary purpose of paying for such labor and material, and that it was the custom of financial institutions making such loans, to require contractors to furnish them paid bills for labor and mate-

_____
[1] 244 Ala. 436.

rials or affidavits that past-due labor and material bills were paid, before making payments to the contractor, but that Security Federal violated its trust by making payments to the contractors without regard to the state of completion of the building and without requiring production of paid labor and material bills or affidavits that such bills had been paid and without exercising any care or precaution to find out whether labor or material bills were being paid by the contractor. That Security Federal should have had enough to pay all unpaid bills for labor and material, and that it is estopped to deny that it holds said funds in sufficient amount to pay said claims in full and that it is entitled to be subrogated to the lien of the mortgage, to the extent of its claim, and it is entitled to priority of payment as against said mortgage. The bill further alleges that on February 6, 1942, Underwood filed a verified account in the probate court, claiming a lien, but as Security Federal had paid to Better Homes all except $570.25, Underwood filed its complaint in this cause to establish and enforce an equitable lien. The bill does not claim a statutory lien, either for the full amount of materials sold, or for the unpaid balance due to the contractor.

The answer denies the facts on which reliance is chiefly had to establish the relation of trust, and takes issue on the conclusions of law asserted resulting in such relation.

Underwood claims and McFarlane testified, that on December 1, 1941, it first learned that some of the jobs for which it was selling material to Better Homes, were being financed by loans made by Security Federal; that on that day, it ordered all deliveries of materials to those jobs to be stopped; that R. R. McFarlane, its vice-president and general manager, then called the office of Security Federal on the telephone and talked with Miss Lucile Camp, its assistant secretary and treasurer; that he told Miss Camp that Underwood had furnished materials on several houses, including the Thompson job, which were being built by Better Homes, Inc., upon which he was informed that Security Federal had made the initial construction loan and asked her whether such was the fact, and if so, if she knew the arrangement in regard to paying out such loan, and that Miss Camp informed McFarlane that such loans had been made by Security Federal and were being disbursed by it, and she knew the arrangement about paying out the money and that the arrangement was that Security Federal should require and did require the furnishing of paid bills for labor and materials for the jobs and affidavits that such bills had been paid, before disbursing or paying out the moneys loaned by it, and that he relied and acted on that assurance. He also testified that on December 11, he had a conversation with Mr. Scott, manager of appellant, who gave him assurance of a similar import, on which he also relied.

Miss Camp testified that she did not remember having talked with McFarlane at all, and denies that she made those statements to McFarlane, and says that she kept the books, knew the arrangement was to pay according to the written schedule on file in the office, had made many payments to Better Homes, according to said schedules, and that no paid bills or affidavits of payment had ever been required of Better Homes, and that Mr. Scott, when leaving on November 28, 1941 for the convention, had instructed her to make payments as usual, and that on December 6, 1941, she paid Better Homes $3075 on account of contracts, but required no evidence of payment of bills by Better Homes.

On December 11th, the Security Federal ledger account for Thompson's job showed $1087 in the hands of Security Federal, and on that day Underwood's account for that job was $1417.10.

Underwood claims that except for the assurances given on December 1st to McFarlane by Miss Camp, and its reliance thereon, it would have furnished no more materials on the Thompson job or other jobs and would have taken steps to establish and enforce its liens to the extent of the then unpaid balance of the contract price, and that except for the statements made by Scott on December 11th, it would have furnished no more materials, and would immediately have taken steps to establish and enforce its lien to the extent of the then unpaid balance of the contract price.

The evidence is undisputed, that on or about January 12, 1942, McFarlane went to the office of Security Federal with a list of jobs for which it had furnished materials, and the amount of materials furnished for each job, and that he told Mr. Scott the amounts due and that Mr. Scott got the ledger and looked at each account and gave Mr. McFarlane the amount then in the

hands of Security Federal and that Mc-Farlane wrote the amounts on a piece of paper, and produced the memorandum at the time of testifying in this case.

That Scott did tell McFarlane at that time that he would get Better Homes to straighten up their accounts, and would make no further payments until they had straightened up their bills; and that Mr. Scott did, at once, take the matter up with Better Homes, and made no further payments to Better Homes, but that Better Homes shortly thereafter abandoned work under all its contracts and left all of the houses unfinished.

Complainant does not show that he relied and acted on that conversation of January 12, supra, or that appellant violated it in any respect, and bases no claim for relief on that account.

On account of its loan to Thompson of $4750, Security Federal made payments to Better Homes: On September 15, $1000; on September 21, $1300; on September 28, $600; on December 6, $600; on December 19, $350; and had charged the account with $10.50 for the cost of recording the mortgage, $10 for appraisal fees, and $95 for a two per cent. service charge, and $47.50 for Title Insurance Company for title guaranty. Better Homes had, at the time the loan was negotiated, agreed that it would pay the last three items and that they should be deducted from the final payment. This left, at the time the contract was abandoned, a balance of $737 in the hands of Security Federal with the house unfinished.

Thompson completed the home at a cost of $166.74, which was paid by Security Federal from the $737 in its hands, leaving a balance of $570.26.

A decree was rendered granting full relief to complainant, Underwood, against Security Federal, appellant.

A study of the legal principles applicable to the foregoing situation leads us into the following discussion.

■ Our statutory system provides the only lien legal or equitable available to a materialman as such, and without more. Emanuel v. Underwood Coal & Supply Co., Ala.Sup. 14 So.2d 151.[1] This cannot be enlarged except by contract express or implied, or by some established equitable principle based on the maxims of equity on a consideration of right and justice. 17 R. C.L. 605, section 14. Courts of equity have by precedent and long usage declared the circumstances when such liens or trusts will be created, when not controlled by contract or statute, and have not left it merely to the trial court to find whether the case in hand presents one where right and justice call for the enforcement of a lien or trust. 10 R.C.L. 262, section 8; 37 Corpus Juris 315, note 69. Right and justice call for the payment of every debt, but that does not fasten a lien on property except pursuant to established principles and equitable maxims, or a recognized duty on one party to give a lien to the other. 37 Corpus Juris 315, note 70; 33 Amer.Jur. 430, section 21. It has never been elsewhere applied by any court or authority to the present situation so far as our study extends. Greil Bros. Co. v. City of Montgomery, 182 Ala. 291, 62 So. 692, Ann.Cas.1915D, 738, and Roberts v. Lindsey, 242 Ala. 522, 7 So. 2d 82, state the fundamental principle on which an equitable lien is created, as above stated. No more of them is here pertinent.

■ When one lends money to an owner who is building a house, he owes no legal duty to the materialman, not based on contract or estoppel, though he knows that it is to be used to pay for materials and labor, to see that it is so used. But he has the right to assume that such materialman will rely on the willingness and ability of the contractor to pay him, or that he will take steps to establish and fix the lien provided by law.

In the case of Jones v. Carpenter, 90 Fla. 407, 106 So. 127, 43 A.L.R. 1409, cited by appellee, Carpenter wrongfully abstracted funds of a corporation, of which he was president, and used them in paying for labor and material in improving his home. Both he and the corporation became insolvent, and a trustee in bankruptcy of the corporation sought to fasten a lien on the home for such funds. The court need not have labored to grant relief. It is based on well-known equitable principles. Much is said in the opinion about equitable liens being based on right and justice, also stating that they are necessarily based on the doctrine of estoppel. That case illustrates clearly a constructive trust, and the court might well have so observed without more. Builders' Supply Co. v. Smith, 222 Ala. 554 (6), 133 So. 721; 26 R.C.L. 235, section 82; Deming v. Lee, 174 Ala. 410, 56 So. 921; Kent v. Dean, 128 Ala. 600, 30

---

[1] 244 Ala. 436.

So. 543; Browning v. Kelly, 124 Ala. 645, 27 So. 391; Summers v. Summers, 218 Ala. 420, 118 So. 912.

Appellee here cannot rest on the principle of that case, since there was no misuse of his funds or effects in violation of confidential relations.

We will next consider the nature of contract here pertinent on which an equitable lien may be founded at the suit of one not a party to it.

■ And as a general rule, one cannot enforce a contract between others by a suit when he is not in privity of contract with the parties to it. David Lupton's Sons Const. Co. v. Hugger, 227 Ala. 25, 148 So. 610. But this principle has been expanded.

In the case of Fidelity & Deposit Co. v. Rainer, 220 Ala. 262, 125 So. 55, 77 A.L.R. 13, we were dealing with a building contractor's bond with surety, whereby it was conditioned to be void if the contractor shall satisfy all claims and demands for labor and material. The terms of the contract did not provide that the laborers and materialmen were to be paid by the surety on the bond, or that the surety was obligated to them in any respect, but he was merely to protect the owner against loss if the contractor did not pay them. We recognized the principle that the laborers and materialmen were not in privity of contract with the surety unless the bond be so interpreted as to mean that they were intended to be directly benefited by it, as distinguished from the indirect benefits which might result from its obligations. If it was construed as being intended directly for their benefit, we held that they could sue on it, naming the obligee of the bond as plaintiff for their use. After much consideration, and by a divided court, we held that the materialmen were by that status in such position as to enforce the bond, on the theory that they were intended to be directly protected by it. This was not in the nature of any distinctive equitable principle, but an enforcement of the contract according to its true meaning and effect. We have no disposition to reflect upon that holding at the present time, though it was very liberal in favor of the materialmen.

■ This idea has been applied to a situation whereby in a building contract, a part of the contract price was retained with the expressed stipulation, that it is "to meet the claims of such persons (including materialmen) until such claims are satisfied," equity would treat the transaction as an assignment of the fund for the benefit of materialmen or subcontractors, upon the theory that by the agreement it was retained for them. Luthey v. Woods, 6 Mo.App. 67; 9 Corpus Juris 705.

Other cases have held that if the fund is withheld by the owner under a stipulation simply that it is so until materialmen shall have been paid by the contractor, it does not mean that it was done for their benefit, but that it was for the benefit of the owner. Getty v. Pennsylvania Inst., 194 Pa. 571, 45 A. 333; Sayre-Newton Lumber Co. v. Union Bank, 6 Colo.App. 541, 41 P. 844; Steele v. McBurney, 96 Iowa 449, 65 N.W. 332; 40 Corpus Juris 365.

In the case of Henningsen v. United States F. & G. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, and Prairie State Nat. Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, there was a bond with surety conditioned to pay promptly and in full laborers and materialmen, whereby under the statute they had a right of action against the surety. The contractor defaulted, and the surety paid them. The question was whether the equity of the surety to apply the unpaid contract price to the materialmen was superior to one who took an assignment from the contractor as security for a loan to finance the job. The court held that when the surety paid the materialmen, it released the contractor from that duty, "and to the same extent released the government of all equitable obligations to see that the laborers and supplymen were paid," [208 U.S. 404, 28 S.Ct. 391, 52 L.Ed. 547] and therefore stood as one with a right of subrogation superior to that of the lender who had an assignment from the contractor.

This principle was applied in our case of Maryland Casualty Co. v. Dupree, 223 Ala. 420, 136 So. 811.

In our case of United States F. & G. Co. v. Butcher, 223 Ala. 606, 137 So. 446, 447, this court by way of elucidating the principle observed: "The asserted equity seems to rest upon the implied duty of the principal to exercise the utmost good faith toward the surety, and in this particular class of suretyship, wherein a fund arises from the execution of the contract secured, good faith demands that such fund be applied to meet the obligations secured by the bond, if necessary to the protection of the surety, and that materialmen, as parties to the same contract, and secured by

the bond, are under a like duty of good faith."

And in United States F. & G. Co. v. R. S. Armstrong & Bro., 225 Ala. 276, 142 So. 576, the court was careful to note that the materialmen had no right in the fund paid to the contractor that would take precedence over another receiving the money from him in ignorance of that right.

We do not understand that the reference in Henningsen's case, supra, to the equitable obligation of the owner (who was the Government in that case) to pay the materialmen, means more than a moral obligation. Equity does not impose on the owner any enforceable duty to protect the materialmen, except as the statute or a contract so requires. Emanuel v. Underwood Coal & Supply Co., 244 Ala. 436, 14 So.2d 151. See Randolph v. Builders' & Painters' Supply Co., 106 Ala. 501(3), 17 So. 721.

It must be noted that the asserted claim did not come into existence until the fund had been paid to the contractor, who owed the materialman, or had been paid directly to him. It was not held to exist while the fund was in the hands of the owner or a lender to the owner in the absence of a contract having that effect. We know of no case which does so. The theory is properly based on the requirement of the exercise of good faith which a principal receiving such fund owes to his surety in respect to the transaction.

To hold that a materialman has an equitable claim in a fund in the hands of a lot owner (or a lender to him), who has engaged a contractor to build a house for a fixed sum as completed, payable in installments as the work progresses, when there is a stipulation between the owner (or lender) and contractor that the installments shall not be paid until proof is furnished to the owner that the contractor has paid bills for material, and the materialman is informed of that fact and relies and acts on the assumption that such arrangement will be complied with, and the owner contemplates that he will do so, is as far as we think the principle of equity based on contract or estoppel will extend relief to the materialman, so far as here pertinent.

In view of this discussion, if the facts are true as Underwood claims, and as we stated at the outset, there was thereby created a right in him properly granted in the decree in this litigation. But it is only upon that basis that complainant may have any relief. So that the question is reduced to one of fact.

The court based its decree upon an implied duty of the lender to see that the materialman is paid, but did not seem to find any contract on the part of the lender which fixed such a legal duty.

The burden of proof is of course. upon complainant to prove that the lender told him in substance, at least, that the arrangement was that he should require and would require the contractor to furnish paid bills or affidavits that the bills for labor and material for the job had been paid; and that complainant had a right to act upon that assurance and in reliance on it did act to his prejudice. That would furnish the consideration for such an assurance, and the elements of an estoppel to deny that the arrangement existed.

To sustain this burden, only Mc-Farlane for complainant so directly testified. Both Miss Camp and Mr. Scott, with each of whom McFarlane claimed to have had the conversation, denied that they had one of that sort. There was no substantial corroboration of either, except the circumstance that the lender had not observed any such practice, and knew of no custom in the trade to do so; and, on the other hand, that the complainant allowed his inchoate lien to lapse by non-action. The trial court did not decide that question. The evidence was taken by deposition and the duty is upon us to make the decision. We see nothing to justify us in holding that any of the witnesses is more or less credible than any others. We cannot say therefore that complainant has met that burden by breaking the balance in his favor. There is no sufficient evidence of a custom to add any such stipulation to the terms of an express contract. For the legal requirements in that connection, see 7 Ala.Dig. 370, 376, Customs and Usages, ☞ 12(2) and 19(3).

Complainant has not based any claim expressly on a statutory lien to the extent of the balance of the contract price unpaid of $570.26. He would be entitled however, to enforce such a lien to that extent, having alleged a compliance with Title 33, sections 37 and 47, Code of 1940, and filed the bill with general prayer within six months after maturity of the entire indebtedness, section 42, Code, supra, in a court having jurisdiction, section 48, Code, supra; but his debtor, Better Homes,

64

should be a party to such a suit. It is not a party, and appellee has not insisted that such relief be decreed. He rests his whole case upon an equitable claim which he has not proved, though sufficiently alleged in his amended bill.

The decree is reversed and the cause remanded.

Reversed and remanded.

GARDNER, C. J., and BOULDIN and STAKELY, JJ., concur.

