E. C. ERNST, INC., Plaintiff-Appellant Appellee,

v.

MANHATTAN CONSTRUCTION COMPANY OF TEXAS, Providence Hospital, Fairbanks-Morse, Inc., Charles H. McCauley Associates, Inc., Defendants-Appellees Appellants.

No. 75–1794.

United States Court of Appeals, Fifth Circuit.

May 9, 1977.

---

1028

Edward S. Sledge, Mobile, Ala., Glower W. Jones, Atlanta, Ga., Arthur Friedman, New York City, for E. C. Ernst, Inc.

Willis C. Darby, Jr., Mobile, Ala., for Providence Hospital.

Louis E. Braswell, Mobile, Ala., for Fairbanks-Morse, Inc.

Clarence L. McDorman, Jr., Birmingham, Ala., for Charles H. McCauley Associates, Inc.

David M. Thornton, Tulsa, Okl., for Manhattan Const. Co.

Before GODBOLD, McCREE * and TJOFLAT, Circuit Judges.

GODBOLD, Circuit Judge:

This complex diversity case arises from a series of disputes concerning difficulties encountered during construction and renovation of a hospital at Mobile, Alabama. The parties are Ernst, an electrical subcontractor on the project; Providence Hospital, the owner; McCauley, the architect; Manhattan, the general contractor; and Fairbanks-Morse, Ernst's electrical supplier. After more than four years of proceedings and a 40-day bench trial, the district court entered its lengthy opinion, 387 F.Supp. 1001 (S.D. Ala.1974).

I. *Ernst's claim for damages*

Ernst's principal ground for appeal is the refusal of the district court to award it damages for delays on the job caused by the other four parties' breaches of their respective duties to Ernst. These other parties have paid Providence for delays. But they have not paid damages claimed by Ernst.

A. *Ernst's claims against Manhattan*

The district court held that Manhattan's failure properly to coordinate and supervise

---

* Judge McCree, of the Sixth Circuit, participated in the oral argument of this case, but did not participate in this decision.

the activities on the jobsite violated paragraph 21(c) of the general conditions of its contract with Providence, that Manhattan assumed the responsibility for delays by other subcontractors (as well as its own) under paragraph 21(b) of the general conditions, that it failed to schedule double shifts once delay had set in and thereby breached the "general requirements" of that contract, and that it failed to schedule work properly, also in violation of the general requirements.

■ Ernst claims that it is entitled to damages for these delays caused by Manhattan. Manhattan points to the following provision of its contract with Ernst:

> An extension of time for the completion of this contract is hereby granted to [Ernst] for a period equal to any delay caused by MANHATTAN CONSTRUCTION COMPANY. Such extension of time shall be in lieu of and in full satisfaction of any and all claims whatsoever of [Ernst] against the MANHATTAN CONSTRUCTION COMPANY.

This is a reformulation of the common "no damage" clause in construction contracts whereby one party contractually limits its own liability for delay damages. Although the Alabama [1] courts have not ruled on the validity of such provisions, their validity is now well established. *See generally Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co.*, 355 F.Supp. 376, 396–401 (S.D.Iowa 1973).[2] Given their harsh effect, courts will strictly construe such provisions but generally enforce them absent delay (1) not contemplated by the parties under the provision, (2) amounting to an abandonment of the contract, (3) caused by bad faith, or (4) amounting to active interference. *Id.* at 397. Ernst claims none of these exceptions, and the delay by Manhattan does not fit any of them.

■ Manhattan's failure to grant Ernst a time extension was not the breach of a condition precedent to Manhattan's invoking the "no damage" clause. The clause makes no reference to any such requirement for formally granting an extension; the language "an extension of time . . . is *hereby* granted" seems to suggest the opposite. The purpose for such a provision would be to assure Ernst that Manhattan (or those upstream from Manhattan) would not sue Ernst for Manhattan's own delays. No one in this case has charged Ernst for those delays; Manhattan has already been charged for them under the liquidated damage formula.

■ Ernst also claims that Manhattan's failure to comply with a separate contractual provision operates to negate the effect of the "no damage" clause. This separate clause appears to be an agreement by Manhattan to assert Ernst's claims for delay damage caused by Providence or any subcontractor, to the extent permissible under Manhattan's contracts with those parties. We are not persuaded that the consequences of breaching this obligation should include a waiver of the "no damage" defense, which concerns damages for *Manhattan's* delays.

## B. *Ernst's claims against Providence*

■ Ernst claims damages for the results of several mistakes made by Providence on the job. The district court found that Providence could not recover liquidated damages for the entirety of the delay on the job because Providence had itself created some of the overall delay by an abortive attempt to change to a gravity sewage ejection system after Manhattan had begun work on a pump system (65 days delay) and by a refusal to accept Palco lighting fixtures in

---

1. The choice of law rules of Alabama apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Although it is unclear from the record where the subcontract was made, this is irrelevant. The validity of contractual provisions is generally governed by the law of the place of making, but the law of the place of full performance gov-

erns where it differs from the former. *J. R. Watkins Co. v. Hill*, 214 Ala. 507, 108 So. 244 (1926); *accord, First Nat'l Life Ins. Co. v. Fidelity & Deposit Co.*, 525 F.2d 966 (CA5, 1976) (Alabama law).

2. *See also* cases cited in Annot., 10 A.L.R.2d 801 (1950).

violation of federal regulations incorporated into the contract (29½ days).[3] Ernst seeks to parlay these findings into a recovery for itself against Providence, pointing out that its "follow-on" electrical work was inevitably delayed to its damage by these same actions.

In order to establish that these actions breached some duty to it established by Alabama law, *see Twine v. Liberty National Life Insurance Co.*, 294 Ala. 43, 311 So.2d 299, 302 (1975), Ernst asserts a third-party beneficiary theory, citing cases imposing owner-general contractor duties and general contractor-subcontractor duties. None of these cases imposes a theory of owner-subcontractor duty. We turn elsewhere in the law of Alabama to determine the validity of third-party beneficiary liability on the facts of this case.

The Alabama courts have made it clear that one not a party to a contract cannot generally sue for its breach. *Twine, supra; Watson v. Mills*, 275 Ala. 176, 153 So.2d 612 (1963); *Land Title Guaranty Co. v. Lynchburg Foundry Co.*, 80 So. 142 (Ala.App. 1918). The Alabama Supreme Court has indicated that the well-established judge-made requirement of vertical privity for manufacturers' liability should not be overturned except by legislative act. *Compare Harnischfeger Corp. v. Harris*, 280 Ala. 93, 190 So.2d 286, 290 (1966), *with Bishop v. Faroy Sales*, 336 So.2d 1340 (Ala.1976) (Alabama version of UCC 2-318 abolishes vertical privity).[4] We think judicial deference is equally applicable in the area of construction contracts.

Third parties may sue on the contract if the provision is intended for their direct, as opposed to incidental, benefit. *See, e. g., Anderson v. Howard Hall Co.*, 278 Ala. 491, 179 So.2d 71 (1965); *accord, Burgreen Contracting Co. v. Goodman*, 55 Ala.App. 209, 314 So.2d 284, *petition for cert. stricken*, 294 Ala. 199, 314 So.2d 296 (1975). The duties to Manhattan that Providence breached (the provision for a sewage ejection pump and an agreement to accept electrical wall fixtures "of equal quality" to Sunbeam fixtures) were not intended for the direct benefit of the electrical subcontractor Ernst. In a large construction project each of the individual contracts is inevitably intertwined with many others, all devoted to the general goal of finishing all phases of the project according to the plans and specifications drawn up by the architect and within the time period established under the prime contract. *See E. C. Ernst, Inc. v. General Motors Corp.*, 482 F.2d 1047, 1055 (CA5 1973). But this interrelationship by itself does not justify imposing third-party beneficiary duties, which flow not from the inevitable consequences of a breach but rather from the intent of the contracting parties.[5] Here the agreement stated in ¶ 21(a) of the general conditions that "[n]othing contained in the specifications or drawings shall be construed as creating any contractual relationship between any subcontractor and the Owner." *See* 4 A. Corbin, *Contracts* § 777, at 25 (1951):

> . . . [I]f two contracting parties expressly provide that some third party who will be benefited by performance shall have no legally enforceable right, the

---

**3.** Ernst incorrectly includes in the delays attributable to Providence an additional 39-day period of delayed access by Manhattan to the old operating room area for renovation work. The district court found that the old operating area "had necessarily been kept in operation until occupancy of the new operating area." 387 F.Supp. at 1010. This delay was not a default on Providence's part.

**4.** The UCC, Ala.Code tit. 7A (1966 Recomp.), does not govern the Providence-Manhattan construction contract. Ernst's contract to supply and install electrical equipment may make it a seller of goods under *id.* §§ 2-102 and -106. *See Port City Constr. Co. v. Henderson*, 48

Ala.App. 639, 266 So.2d 896 (1972). But Ernst's capacity is irrelevant to the nature of Providence's contract with Manhattan.

**5.** In the construction context the nature of this intent requirement is best illustrated by the type of relationship that does give rise to third-party beneficiary liability. This is the right of subcontractors in certain situations to sue on a bond between contractor and surety made for the obvious purpose of protecting their contractual rights. *See Security Fed. Sav. & Loan Ass'n v. Underwood Coal & Supply Co.*, 245 Ala. 56, 16 So.2d 100 (1943).

courts should effectuate the expressed intent by denying the third party any direct remedy.

Ernst's effort to proceed against Providence on a third-party beneficiary basis must fail.

### C. *Ernst's claim against McCauley*

■ The district court found that McCauley, the architect for Providence, was responsible for (1) refusing to approve the Palco bedlight fixture application and (2) for the emergency generator system, (a) drawing faulty specifications [6] and (b) failing promptly to act on submittals.[7] Neither the owner-architect agreement nor the Providence-Manhattan contract made any reference to the measure of liability from McCauley to Providence. However, the district court recognized that agents are liable to their principals for their "deficiencies" [8] and utilized against McCauley the liquidated damage measure in the Providence-Manhattan contract because McCauley was instrumental in including this provision. 387 F.Supp. at 1033.[9] Ernst seeks the benefit of these findings, claiming that the delays

in these electrical-oriented problems also delayed it. Ernst claims that it is a third-party beneficiary to the owner-architect agreement and reinvokes its earlier-dismissed negligence argument as well.[10]

McCauley raises two different theories that it argues prevent Ernst from recovering. The first, and more broadsweeping, of these challenges Ernst's status as a third-party beneficiary to the owner-architect agreement. We have already described the general rule in Alabama concerning third-party rights under contracts (in denying Ernst any rights under the owner-contractor agreement). Ernst may sue under the contract only if the particular provision is intended for its direct, as opposed to incidental, benefit. The special role of an architect on a construction project may call for third-party beneficiary rights here, although recent cases have specifically rejected this idea. See, *e. g., Detweiler Bros., Inc. v. John Graham & Co.,* 412 F.Supp. 416 (E.D.Wash.1976); *A. R. Moyer, Inc. v. Graham,* 285 So.2d 397 (Fla.1973).[11] *See generally Annot.,* 65 A.L.R.3d 249 (1975). We need not decide the difficult question

6. The generator specifications were found faulty in the following regards. They violated federal requirements that the engine be identified by specific model number, they listed engines as acceptable that actually failed to satisfy the horsepower requirements, and they allocated insufficient space to accommodate the engines. 387 F.Supp. 1027–28.

This last finding is sufficient response to Fairbanks' claim that the district court charged it for delays in the emergency generator area actually caused by difficulties in housing the Caterpillar substitute. The court attributed this portion of the delay to McCauley's defective specifications and charged McCauley accordingly.

7. *I. e.,* matters referred to him pursuant to ¶¶ 5–6 of the general conditions, for a decision regarding their compliance with the plans and specifications.

8. 387 F.Supp. at 1028, 1033. The court did not indicate whether it held McCauley liable under its contract with Providence or under principles of negligence. *Compare Daugherty v. Gulf Shores Motel, Inc.,* 292 Ala. 252, 292 So.2d 454 (1974) (contract), *with McPheeters v. Heard,* 332 So.2d 733 (Ala.Civ.App.1976) (negligence).

9. This ruling has not been appealed. McCauley's two-paragraph cross-appeal asserts different grounds for reversal.

10. Ernst also claims that by purchasing a copy of the plans and specifications prepared by McCauley it stood in a contractual relationship with McCauley and can sue for breach of an implied warranty that the plans were fit for their intended purpose. Ernst cites no authority that supports this position, and we reject it. McCauley prepared the plans for Providence, which paid valuable consideration for them. Ernst needed them solely because its subcontract with Manhattan required it to follow them. Ernst could not be deemed a "purchaser" from McCauley to which implied warranties would run simply because it bought a copy of a document incorporated by reference in its own contract. Viewed in another light, what Ernst bought was a copy and the sole warranty was that it was a true copy of the original.

11. The *Moyer* holding appears to have been influenced by the fact that the particular agreement involved was not part of the record. (The case arose from certification by a panel of this court.) While we have the advantage that the Florida court did not, the McCauley-Providence agreement sheds little light on the subject.

whether Alabama would depart from this rule, for we agree with the further holdings of the *Moyer* line of cases that contractual privity is unnecessary for recovery on a negligence theory. As the subcontractor on the project responsible for the installation of these two systems, Ernst surely falls within the scope of the risk created by McCauley's actions.[12]

■ As we have noted, the district court characterized McCauley's delays as "deficiencies." The court did not specify whether this meant that the firm had failed to perform adequately under its contract with Providence, that it had failed to satisfy an objective standard of care required under tort principles, or both. Having ruled in favor of a theory of recovery based upon negligence, we have no difficulty in clarifying the district court's findings by deciding that McCauley's activities regarding its arbitral responsibilities on the emergency generator submittals constituted negligence as a matter of law. They represent a pattern of procrastination [13] which, in view of the interdependence of effort so vital on a construction project, falls below the standard of care required in this situation for professional architects.[14] However, whether McCauley's erroneous rejection of Palco bedlight fixtures also constituted negligence is a closer question that we cannot answer from our appellate perspective. We leave this determination for the district court on remand. For similar reasons, we remand the question of negligence with respect to McCauley's faulty plans and specifications.

■ McCauley's second line of defense is more troublesome. It claims that it is protected from liability for at least some of its errors by the immunity granted to architects in performing their arbitral/quasi-judicial functions. McCauley makes this immunity argument despite already having been found liable to Providence below for the same errors and having taken no appeal from that general ruling.[15] Neither the record below nor the district court's opinion reveals whether or not McCauley asserted the immunity unsuccessfully in that court-constructed [16] claim by Providence. However, McCauley did raise this bar against the claims of Ernst and Manhattan below, and it is entitled to a ruling from this court, as we address these latter claims, regarding the validity and scope of the immunity.

The leading Alabama case on immunity of architects as arbitrators is *Wilder v. Crook*, 250 Ala. 424, 34 So.2d 832 (1948). The contractor sued the owner (the city) and the engineer hired by the owner to supervise the work, claiming that the engineer's ruling as to the contractor's responsibilities under the contract was incorrect. State law required that the contractor bring suit in the county in which a "material defendant" resided; thus, if the theory of recovery against the engineer failed, suing in the engineer's county of residence would

---

12. McCauley insisted at oral argument that, should we sustain a negligence approach, Ernst would still be barred from recovery due to its contributory negligence. But the district court absolved Ernst of any fault with respect to the bedlight and generator matters under consideration here.

13. The nature of McCauley's activities on the job site is described in detail by the district court in its findings of fact, 387 F.Supp. at 1018–26. We discuss the particulars of the generator submittal problems below in dealing with the immunity question.

14. Of course, the mere breach of one's contract does not give rise to liability in tort, which creates duties by operation of law that are collateral to those created by agreement of the parties. *C & C Prods., Inc. v. Premier Indus.*

Corp., 290 Ala. 179, 275 So.2d 124, 130 (1972). *See also Berry v. Druid City Hosp. Bd.*, 333 So.2d 796 (Ala.1976), *reviewed in* 7 Cum.L.Rev. 355 (1976); *accord, Horton v. Northeast Ala. Regional Medical Center, Inc.*, 334 So.2d 885 (Ala.1976). Here, however, we have pretermitted whether there is a breach of a contractual duty owed to Ernst. We reach our finding of negligence without regard to the terms of McCauley's contract with Providence.

15. *See* note 9, *supra.*

16. The district court framed Providence's claim on its own through a pretrial order. The court had previously ordered Providence to pay over additional contract sums despite the existence of legal disputes about the adequacy of performance by various parties.

have been improper. The contractor argued that the engineer "personally assumed a duty under the [owner-contractor] contract." But because the engineer had acted pursuant to a contractual provision appointing him the arbiter of all contractual disputes, the court held that he enjoyed immunity:

> By the terms of the contract R. L. Kenan was placed in a position somewhat analogous to that of an umpire or arbitrator. His decisions were accordingly judicial in nature. Under the circumstances the authorities appear to hold that he could not be held liable in damages for failure to exercise care or skill in the performance of his functions. The same principle seems to apply even where the decision is the result of fraud or corruption.

*Id.* at 834.[17]

As in *Wilder,* the owner-contractor agreement here provides for the architect's ruling on questions of contract interpretation:

> It shall be the responsibility of the Architect to make written decisions in regard to all claims of the Owner or Contractor and to interpret the Contract Documents on all questions arising in connection with the execution of the work.

General Conditions ¶ 6(a). Two of McCauley's "deficiencies" fit into this arbitral/quasi-judicial category—its rejection of the acceptability of Palco bedlight fixtures and its long-term set of rulings on the acceptability of the Fairbanks emergency generator. However, with respect to both of these matters, the question is not the insulation of McCauley from suit because of a decision it made but, more accurately phrased, its immunity from suit for failing, or delaying, in making decisions.

The arbitrator's "quasi-judicial" immunity arises from his resemblance to a judge. The scope of his immunity should be no broader than this resemblance. The arbitrator serves as a private vehicle for the ordering of economic relationships. He is a creature of contract, paid by the parties to perform a duty, and his decision binds the parties because they make a specific, private decision to be bound. His decision is not socially momentous except to those who pay him to decide. The judge, however, is an official governmental instrumentality for resolving societal disputes. The parties submit their disputes to him through the structure of the judicial system, at mostly public expense. His decisions may be glossed with public policy considerations and fraught with the consequences of stare decisis. When in discharging his function the arbitrator resembles a judge, we protect the integrity of his decisionmaking by guarding against his fear of being mulcted in damages. *Cf. Broom v. Douglass,* 175 Ala. 268, 57 So. 860 (1912). But he should be immune from liability only to the extent that his action is functionally judge-like.[18] Otherwise we become mesmerized by words.

In his role as interpreter of the contract and as private decisionmaker, the arbitrator has a duty, express or implied, to make reasonably expeditious decisions. Where his action, or inaction, can fairly be characterized as delay or failure to decide rather than timely decisionmaking (good or bad), he loses his claim to immunity because he loses his resemblance to a judge. He has simply defaulted on a contractual duty to both parties.

We are mindful of the problems of characterization that may attend the distinction between delay in deciding and bad judgment in the decision itself. The idea of a misfeasance-nonfeasance dichotomy has been subject to question. *See* W. Prosser, *Torts* § 56, at 339-40 (4th ed. 1971).[19] But

---

17. There is no indication that this rationale for immunity would not extend to suits brought in tort. Indeed, the language "failure to exercise care or skill" seems to apply directly to Ernst's negligence claim as well. *See also Broyles v. Brown Eng'ring Co.,* 275 Ala. 35, 151 So.2d 767, 772 (1963).

18. *See* 6 C.J.S. *Arbitration* § 74, at p. 289 & nn. 15-16 (1975).

19. *But cf. Berry v. Druid City Hosp. Bd.,* 333 So.2d 796, 799-800 (Ala.1976) Shores & Almon, JJ., with Embry, J., & Heflin, C. J., concurring on this point). While its interpretation is not free from doubt, Justice Shores' dictum in *Ber-*

with respect to the generator submittals here, the pattern seems obvious. The tentative, incongruous, and often contradictory nature of McCauley's actions constitutes a default to all parties in the contractual sense that we have described.

The tone of McCauley's course of action was set by its first step. Fairbanks' initial application was met with the one-sentence equivocal response that the generator units were "approved providing that the requirements of the plans and specifications are met." [20] By February 1969 McCauley had discovered the foreign-manufacture problem. In April it shifted its criticism to the problem of available spare parts. It then shifted to a complaint that the engines were not a standard product and did not meet the horsepower requirement. It then urged resubmittal. In the view of the district court, the result of this last action was "to start the entire process over again from the beginning at a time when construction progress was already seriously impeded." 387 F.Supp. at 1021. After it had rejected two more resubmittals, McCauley wrote Manhattan in September 1969 asking for verified horsepower tests. McCauley called a meeting at the end of October, the result of which was to ask for another submittal, this time with a different engine. By now, Manhattan had become seriously concerned about the delays resulting from McCauley's failure to take definitive action. Three times in December 1969 and January 1970 Manhattan wrote McCauley to spur the latter to action. McCauley's failure to do anything prompted Manhattan to request an unlimited extension of the completion date because of this lack of cooperation. Equiv-

ocation continued. At a March 1970 meeting, McCauley first said that it would accept the generator subject to tests, then agreed to accept it prior to tests. Six days later, McCauley changed its mind and disapproved the system. Even so, not until May of that year did McCauley finally ask for a new system, specifying the particular models that would be acceptable. Throughout this entire time period McCauley consistently failed to list its reasons for disapprovals, a step which could perhaps have been used to resolve the growing impasse. This pattern of action demonstrates a consistent failure to make decisions in a way that could enable construction to continue. Only McCauley had the authority to make these decisions, and it failed to fulfill that responsibility. The resulting damages Ernst seeks here represent compensation not for McCauley's finally selecting a different generator system but rather for this failure to decide. We cannot extend the arbitral immunity to such conduct.

We next examine McCauley's claim of immunity with respect to its rejection of Palco bedlight fixtures.[21] Here, the district court found a pattern of action similar to, though less drawn out than, its response to the generator submittals.[22] In characterizing McCauley's activities, we take care in distinguishing Providence's decisions from McCauley's responsibilities as arbitrator. Providence made a decision in advance of bid submissions that only Centron-5 fixtures would do. This decision (a wrong one for which Providence has been charged) was different from the architect's decision on subsequent submittals. With respect to this responsibility, McCauley never acted.

---

ry has announced as a rule in Alabama that one who clearly has a cause of action for breach of contract can also recover in tort only if the defendant's action can be characterized as misfeasance. Here, we view McCauley's action as nonfeasance and yet do not disallow recovery based on negligence. But Ernst has no separate contractual claim. Even if it did, we think the cases that Justice Shores relied upon in *Berry* make it clear that the rule would not bar Ernst's recovery in tort here. *See Old S. Life Ins. Co. v. Woodall,* 295 Ala. 235, 326 So.2d 726 (1976); *C & C Prods., Inc. v. Premier Indus. Corp.,* 290 Ala. 179, 275 So.2d 124 (1972). We

understand these cases to say that the breach of contract, without more, cannot justify recovery in tort. *See* note 14, *supra.* They do not deny the right to a tort recovery here.

**20.** Manhattan Exh. 36.

**21.** The parties have not briefed the question of the effect here of federal regulations requiring competitive bidding. We decline to enter this thicket on our own.

**22.** *See* 387 F.Supp. at 1017–18 (findings 47–49).

"McCauley refused even to look at a sample of the Palco fixture delivered to its offices.", 387 F.Supp. at 1017. Later, each of the. Palco submittals was marked "disapproved for reasons noted"; yet McCauley gave no, such reasons. *Id.*[23] While this failure to arbitrate is admittedly tied closely to Providence's earlier affirmative decision to accept only Centron-5 fixtures, McCauley had decisional responsibilities subsequent to this and independent of its status as advisor to the owner. It failed to exercise these responsibilities, and so here, too, it cannot obtain immunity in damages. As noted above, we leave for the district court the question whether this "deficiency" constituted negligence.

Ernst's claim that defects in McCauley's generator plans and specifications also contributed to its delays challenges mistakes not even arguably made in the capacity of arbitrator. We read *Broyles v. Brown Engineering Co.,* 275 Ala. 35, 151 So.2d 767 (1963), as imposing upon architects drawing up plans and specifications not "a contract of guaranty or insurance of favorable results," *id.* at 771, but "a guaranty of reasonable results," *id.* at 772. *See Centraal Stikstof Verkoopkanter, N.V. v. Walsh Stevedoring Co.,* 380 F.2d 523, 529–31 (CA5 1967) (interpreting *Broyles*). We interpret this implied warranty under contract to be equally applicable under negligence claims. The facts of *Broyles* confirm this view. The plaintiffs in that case had failed to allege negligence, and the court's opinion sought to protect them by finding a similar duty implied under the contract:

> Certainly a contracting party has a right to expect the survey to be done with *reasonable accuracy chargeable to the profession,* and should not be dependent in his effort to recover damages on *an allegation of negligence or unskillful and imprudent work.*

**23.** We do not hold that architects-as-arbitrators must issue satisfactory statements of reasons for their decisions in order to maintain their immunity from suit. We point to this action by McCauley only as evidence of its failure to rule on the Palco submittals at all.

151 So.2d at 772 (emphasis supplied).[24] Again, if the district court finds on remand that the "deficiencies" in the plans and the specifications constituted negligence, then Ernst is entitled to recover for its delay damages attributable to this particular act.

### D. *Ernst's claims for damages from Fairbanks*

■ The court awarded Ernst $61,626.12 actual damages against Fairbanks (in addition to a pass-through of liquidated damages to Providence). This figure represents the difference between Ernst's price to Manhattan for obtaining and installing the Fairbanks generator system and Manhattan's replacement cost in purchasing and installing the substitute Caterpillar-driven system. As such, it is simply an indemnity to Ernst for its payment of this same amount to Manhattan.

Despite objections by both parties to this figure, we uphold its propriety. Ernst claims, in effect, that Fairbanks should pay its installation fee. But Ernst never installed anything. Fairbanks claims that $12,764.59 of the $61,626.12 figure is a windfall to Ernst. The theory here is that Ernst should bear the loss represented by Manhattan's installation expenses, since Fairbanks never contracted to install a generator but only to supply one. This seems a simple case of requiring the breaching party in a contract for the sale of goods to pay consequential damages. Ala.Code tit. 7A, § 2-715(2)(a) (1966 Recomp.).

■ Ernst claims in addition that Fairbanks should pay its share of any damages for the delay sustained by Ernst as a result of the defective generator. We agree that Ernst has a contractual claim against Fairbanks for this consequence of the latter's breach. The district court should determine the extent of these delay damages actually caused by Fairbanks.

**24.** For a list of similar cases supporting liability of architects to third parties for defects in plans and specifications, see Annot., 65 A.L.R.3d 249 (1975).

The district court also charged Fairbanks with punitive damages for its fraud with respect to the generator matter. Ernst[25] appeals from this award to it of $20,000 in punitive damages on ground that the court focused too sharply on the cost of the generators rather than on Fairbanks' net worth. The factfinder is not required to consider the wealth of the defendant as paramount. His decision to award punitive damages should be based on "the enormity of the wrong and the necessity of preventing similar wrongs." *Loch Ridge Construction Co. v. Barra,* 291 Ala. 312, 280 So.2d 745, 751 (1973). The district court here recognized this principle in observing generally that "the greater the wrong the greater the damage." 387 F.Supp. at 1031. The amount of punitive damages was within the discretion of the trier of the facts.

### E. Problems of proof on remand

On remand the court will face the question of whether Ernst has satisfactorily proven that the extended time devoted by its personnel to this project has resulted in financial loss.[26] We intimate no view on this question. Ernst must also prove to what extent the actionable failings of Fairbanks and McCauley were responsible for these alleged losses. Its proof of the fact of loss should be measured against the "reasonably certain" standard adopted in *United Bonding Insurance Co. v. W. S. Newell, Inc.,* 285 Ala. 371, 232 So.2d 616, 624 (1969). And its proof of amount of loss, as well as attribution to the above two causes, should be governed by the "fair and reasonable estimate" language cited in *Newell.* The appellees argue for the application of a nonapportionment rule, based upon *Kershaw Mining Co. v. Lankford,* 213 Ala. 630, 105 So. 896 (1925). We see the *Kershaw* rule as simply a refinement of the general proposition in Alabama that damage must be proven with reasonable certainty. See *Mobile & O. R. Co. v. Red Feather Coal Co.,*

218 Ala. 582, 119 So. 606, 609 (1928) (dictum) (citing *Kershaw*). Where the plaintiff does present evidence of attribution to various causes, he may recover under the reasonable certainty standard. *See Tanner v. Case,* 277 Ala. 641, 173 So.2d 803, 808 (1965).

Unlike the plaintiff in *Kershaw,* Ernst faces four defendants all of whom together were in fact responsible for the great majority of its damages. Each seems to point its finger at the others. Fairbanks, for example, claims that its fraud caused no delays in the generator installation because other pre-existing delays were concurrent with its fraud. In this context, the district court can, as it did regarding Providence's claims, ascertain Ernst's total damages and then, where there exists a legal duty to Ernst as discussed above, allocate respective responsibilities for those damages based upon reasonable certainty.

### F. Ernst's claim for attorney's fees

The district court refused to award Ernst attorney's fees on the basis of Fairbanks' agreement in its contract with Ernst to *"indemnify* [Buyer] against all liabilities for damages or injuries incurred by the Buyer, for Buyer's cost, resulting from Seller's failure to make timely delivery of the materials specified herein." (Emphasis supplied).

In Alabama attorney's fees are not recoverable unless provided for in the contract or by statute. *State v. Alabama Public Service Commission,* 307 So.2d 521, 540 (Ala. 1975). The district court did not examine whether the above indemnity provision constituted such a contractual provision for fees but skirted this issue by ruling:

Without characterizing the elements constituting the quantum of punitive damage, suffice it to say, the Court does not feel that any additional amount should be added to this for attorney fees and expenses.

---

**25.** Manhattan also appeals from an identical punitive damage award to it from Fairbanks, adopting the arguments made by Ernst. Our holding applies to both appeals.

**26.** Because of its liquidated damage clause, Providence did not confront this issue. Ernst, unlike Providence, has no time-based measure of damages by which it may automatically assess and apportion its damages.

387 F.Supp. at 1034. We do not know how to interpret this conclusion. If the court was in fact including within its $20,000 punitive damage award some indeterminate compensatory amount for fees, then it applied a legal theory that has since been rejected. An intervening decision of this court, *Burgess v. Williamson*, 506 F.2d 870, 877–78 (CA5 1975), has held that Alabama does not include a punitive damages exception to the general rule against compensatory recoveries of attorney's fees. On the other hand, perhaps the district court did not really decide that an award of attorney's fees was appropriately included within punitive damages. In either case, we face the question that the district court avoided: does the above agreement to indemnify against "liabilities for damages . . ., for . . . cost" resulting from Fairbanks' delay provide a basis for Ernst to recover its attorney's fees? We hold that it does, to some extent.[27]

■ The Alabama courts have not squarely addressed the issue of whether or when indemnity agreements contemplate the payment of attorney's fees. *Cf. Miller & Co. v. Louisville & Nashville R.R.*, 328 F.2d 73, 78 (CA5), *cert. denied*, 377 U.S. 966, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964) (Alabama law), holding that judgment against the indemnitee in a third party's suit would entitle it to "the costs of defending the claim" as well as the amount of liability. *Miller* at least suggests that Alabama would follow the generally held view that

indemnification agreements contemplate payment for attorney's fees incurred in litigation with third parties concerning the matter indemnified against, regardless of whether they say so. See, *e. g., Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 491 F.2d 192, 198 n. 9 (CA8 1974); *Insurance Co. of North America v. King*, 340 So.2d 1175 (Fla.D.Ct.App.1976); *cf.* 5 A. Corbin, *Contracts* § 1037, at 225–26 (1964 & Supp.1971). Inclusion of attorney's fees is presumed to have been the intent of the drafter unless the agreement explicitly says otherwise.[28] This rule simply gives effect to the very nature of indemnity, which is to make the party whole. "[T]rue indemnification would contemplate the inclusion of these items . . . ." *Seaboard Coast Line Railroad v. Tennessee Corp.*, 421 F.2d 970, 975 (CA5), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1819, 26 L.Ed.2d 91 (1970) (dictum). The reference to "cost" in the Ernst-Fairbanks agreement was not an explicit denial of the right to attorney's fees. We do not even interpret it to be an implied denial,[29] although in view of the rule above we need not go this far. As a result, we hold that the agreement contemplates recovery of relevant attorney's fees.

■ The cases cited above limit the recovery of attorney's fees to the subject matter of the indemnity agreement and exclude fees expended in suing the indemnitor in order to recover under the agreement. Accordingly, Ernst may recover from Fairbanks only those fees that it can

---

**27.** Our holding may require some re-evaluation by the district court of its $20,000 punitive damages award to Ernst. If the court was requiring the payment of attorney's fees as part of the $20,000, Fairbanks should not now have to pay again for these fees under an indemnity theory. While our own scrutiny of punitive damages awards is limited, we think the district court should be permitted to re-evaluate its award in light of *Burgess*.

**28.** The fact that there is no need for a specific provision in the contract is perhaps best evidenced by cases applying the rule to indemnities arising by operation of law. *See, e. g., Dow Chem. Co. v. Barge UM–23B*, 424 F.2d 307, 312 (CA5 1970); *Celotex Corp. v. Becknell Constr., Inc.*, 325 So.2d 566 (Miss.1976).

**29.** *Compare Pennsylvania R.R. v. Chicago, M., St. P. & P. R.R.*, 389 F.2d 67, 70 (CA7 1968) (alternative holding) ("all judgments and costs that may be rendered" refers only to court costs, not attorney's fees), *with B & G Elec. Co. v. G. E. Bass & Co.*, 252 F.2d 698, 701 (CA5), *cert. denied*, 357 U.S. 931, 78 S.Ct. 1372, 2 L.Ed.2d 1371 (1958) (" 'Any expense' includes, of course, attorney's fees"). The provision for "cost" here is more probably used as synonymous with "expense." It says nothing about the costs being "rendered" with a "judgment," which reference might imply the more technical concept of court costs. *Cf. Fitzpatrick v. Bitzer*, 427 U.S. 445, 459–460, 96 S.Ct. 2666, 2673, 49 L.Ed.2d 614, 624 (1976) (Stevens, J., concurring).

show were related to its litigation of the generator matter.[30] This leaves the question whether Ernst can recover fees expended in pursuit of delay damages against Fairbanks itself. This is not precisely what the rule contemplates when it denies a right of recovery for fees expended in pursuit of indemnity itself. However, we still find recovery for this portion of the fees inappropriate. The terms of the agreement speak of indemnity for "liabilities." To us, this seems to refer to the classic indemnity situation whereby one party agrees to pay a second for all the consequences of legal action concerning a third. It does not mean indemnity against all financial damage suffered.

In sum, Ernst may recover for attorney's fees expended only in connection with the generator litigation, excluding that part of such litigation involving Ernst's claims against Fairbanks. The district court ruled that such apportionment would be impossible, given the vast number of claims in this suit. But it did so without allowing any proof about attorney's fees at all, that matter being reserved for post-trial consideration. On remand, the court should consider evidence on this issue, with due regard to the reasonable certainty standard articulated above.

## II. *Ernst's challenge to Providence's liquidated damage recovery*

At an early stage of this proceeding, the district court ordered Providence to pay over an added portion of the contract price (through Manhattan) despite the existence of various disputes concerning the work. The court then framed by a subsequent pre-trial order the question of Providence's entitlement to liquidated damages under its contract with Manhattan, at the rate of $250 per day of delay. As we have noted, the court then proceeded to the difficult task of ascertaining which parties were responsible for which parts of the delays. It ordered McCauley to pay its share and ordered the three other parties (through Manhattan) to pay their shares, deducting these from the balance of the contract price which Providence had yet to pay.

 Liquidated damage provisions in contracts are enforceable under Alabama law as long as the contractual stipulation is reasonable and the measure of damages at the time of the contract was conjectural and uncertain. This rule has been applied to provisions against delay in performance on construction contracts. *Otinger v. Water Works & Sanitary Sewer Board,* 278 Ala. 213, 177 So.2d 320 (1965). None of the parties disputes the conjectural nature of delay damage in a case like this one or the lack of disproportion in the $250 per day damage formula.

 However, Ernst seeks to avoid an assessment of liquidated damages by the so-called rule against apportionment.[31] This rule states that under a liquidated damage provision against delay, where the owner has contributed to delays on the project he may not apportion the fault but forfeits all right to recover under the provision. The rule has been adopted by some jurisdictions but rejected by others.[32] The Alabama courts have never been presented with the decision of whether to adopt it or allow apportionment. *Cf. Kershaw Mining Co., supra* (concerning apportionment for actual damages).

Like the Alabama district judge, we believe that Alabama would permit apportionment of fault. The opposing rule is an old one whose underlying policies do not remain in full force. One of the dominant reasons underlying it is early judicial hostility to the use of privately agreed upon contract damage remedies. See, *e. g., Mosler Safe*

---

**30.** These would include the original declaratory judgment action Ernst brought against Manhattan insisting that the Fairbanks generator conformed to the specifications. Application of the general rule does not depend upon who was the plaintiff in the third-party litigation.

**31.** Ironically, Ernst seeks a recovery based on proportional fault of actual damages but opposes Providence's attempt to so recover by way of a damage formula provided for in the contract.

**32.** *See* Annot., 152 A.L.R. 1349, 1359–78 (1944).

Co. v. Maiden Lane Safe Deposit Co., 199 N.Y. 479, 93 N.E. 81 (1910):

> While such an agreement has not the harshness of a penalty, it is, nevertheless, in its nature, such that its enforcement, where the party claiming the right to enforce has, in part, been the cause of delay, would be unjust.

Today, given the increasing complexity of contractual relationships, liquidated damage provisions have obtained firm judicial and legislative support. See, e. g., Otinger, supra; Ala.Code tit. 7A, § 2–718 (1966 Recomp.). As long as the owner's own delay is not incurred in bad faith, it is not unjust to allow proportional fault to govern recovery. Generally, owners do not benefit from delays that they incur. Another reason cited in support of the rule is that proving apportionment is simply too difficult. We do not disagree with the difficulty of the task,[33] but recovery should not be barred in every case by a rule of law that precludes examination of the evidence.[34] The district court did not err in allowing apportioned liquidated damages to Providence.

**33.** There are two different levels of "apportionment" that the district court had to reach here. The first was apportioning damage (i. e., the number of days of delay) in fact caused by each of the problems on the project. On this issue the court "[found] it impossible to affix periods of delay with any degree of accuracy, except with respect to the emergency generator, the explosion-proof receptacles and the bedlight fixtures." 387 F.Supp. at 1011. The court nevertheless assigned a delay time to each problem. Apportionment in this sense of the term, under liquidated damage provisions, is an apportionment of time.

The second step, necessary only for the generator and the bedlight fixture problems, was apportioning fault for a given delay between its two contributors. The court split fault equally for both of these problems. Cf. United States v. Reliable Transfer Co., 421 U.S. 397, 407, 95 S.Ct. 1708, 44 L.Ed.2d 251, 260 (1975).

**34.** Increasingly the courts are apportioning fault in negligence cases by application of rules of comparative negligence.

**35.** "6. Architect's Decisions.—(a) It shall be the responsibility of the Architect to make written decisions in regard to all claims of the Owner or Contractor and to interpret the Contract Documents on all questions arising in connection with the execution of the work.

### III. Ernst's appeal on the electrical receptacles

Ernst concedes that its workmen installed the receptacles improperly but claims that this caused no delay (i. e., no damage). The district court's findings of delay, 387 F.Supp. at 1014–15, are not clearly erroneous.

### IV. Manhattan's claims for delay damages

Like Ernst, Manhattan claims actual damages for delays resulting from other parties' mistakes. Much of what we have said about Ernst's claims applies with equal force to Manhattan's, but we examine each party's potential liability to Manhattan separately.

#### A. Claims against Providence

Manhattan's claim here is stronger than that of Ernst, since Manhattan and Providence stood in privity of contract. Providence contends, however, that by failing to pursue the arbitration provisions of the general conditions in their contract,[35]

"(b) Except as otherwise specified, all the Architect's decisions or interpretations of contract requirements are subject to arbitration.

"(c) If the Architect fails to make a written decision or written interpretation of the contract requirements on any question within ten days after written request for same by either party to the contract, either party may then demand arbitration, in which event later decision by the Architect shall not stop the arbitration proceedings except with the mutual consent of both parties to the contract.

"7. Arbitration.—(a) It is mutually agreed that all disputes arising in connection with this contract shall be submitted to arbitration in accordance with the provisions of the current Standard Form of Arbitration Procedure of the American Institute of Architects and that all findings of fact by the arbitrators under this agreement shall be conclusive and binding on both parties. It is further mutually agreed that the decision of the arbitrators shall be a prior condition to any right of legal action which either party to the contract may have against the other.

". . . . .

"(c) Demand for arbitration in connection with any dispute shall be filed in writing with the Architect and with the other party to the contract. Any demand for arbitration shall

Manhattan cannot assert its claim in federal court. Manhattan's response is that the activities of Providence constituted a waiver of the right to demand arbitration. The district court agreed, and we do also.

This question is one of federal law, given the enactment of the United States Arbitration Act of 1925, 9 U.S.C. §§ 1 *et seq.*,[36] even though this is a diversity case. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404–05, 87 S.Ct. 1801, 18 L.Ed.2d 1270, 1278 (1967); *accord, Stokes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 523 F.2d 433, 437 (CA6 1975). Section 3 of the Act reads:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, *providing the applicant for the stay is not in default in proceeding with such arbitration.* [Emphasis supplied].

The first indication of the parties' attitude about arbitration is an April 7, 1970, telephone conversation to Manhattan from Providence's attorney, in which the attorney

> pointed out that the Architect turned down the [D]orman engine in September

of 1969. He further contends that by not requesting arbitration within the following six months period, the contractor waived his right for arbitration. He proposed that if they, at this point, requested arbitration, Providence Hospital will file a suit in federal court asking that arbitration be disallowed and that the contractor be required to furnish an engine meeting specifications.[37]

The only other evidence of any pre-suit reference to arbitration is a September 17, 1970, letter to Manhattan from its own attorney. This letter asked Manhattan to date, sign, and complete an enclosed AIA Demand for Arbitration and file it with the AAA Regional Office, sending copies to Providence and McCauley.[38]

Ernst's complaint initiated this suit on October 28, 1970. Providence's initial pleading, filed December 16, 1970, was captioned as a "motion to dismiss" Manhattan's claim and alternatively "to stay the action." The requested "stay" was not for purposes of resort to arbitration but to require Manhattan to finish construction first. Attached to the motion was a copy of the 20-page general conditions of the contract, paragraphs 6 and 7 of which concerned arbitration. Providence filed a supplemental brief which referred to arbitration but only as a ground for dismissing Manhattan's suit. For the next two and a half years Providence litigated—it engaged in discovery, presented cross-claims (trying to appeal to this court from dismissal of some of them), and filed various motions.[39] It never brought up arbitration except to deny

---

> be made within thirty days after the dispute has arisen if practicable, but, in any event, no demand for arbitration shall be made after the date of final payment except in the case of a dispute arising in connection with any guarantee provisions of the Contract Documents."

**36.** Though no explicit finding was made, the Providence-Manhattan contract obviously is a transaction involving commerce, so the Act applies. Insofar as *Gavlik Constr. Co. v. H. F. Campbell Co.,* 526 F.2d 777, 784 (CA3 1975), suggests the need for explicit findings in a case involving this clear a dependence upon interstate commerce, we decline to follow it.

**37.** Ernst Exh. 268. This assertion that Manhattan had already waived arbitration had no merit. The architect had not rejected the Dorman engine in September 1969, but as we have indicated, was in the midst of almost two years of indecision.

**38.** There is no evidence that this demand was ever executed.

**39.** For this reason, this case is distinguishable from *General Guar. Ins. Co. v. New Orleans Gen. Agency, Inc.,* 427 F.2d 924 (CA5 1970), holding that one does not waive his right to a stay for arbitration by failing to file a pre-suit demand for it.

Manhattan's assertion that it (Manhattan) had earlier sought arbitration pursuant to the contract. In May (or possibly April) 1973, Providence for the first time asserted that Manhattan's sole remedy was arbitration. In view of this pattern of pre- and post-suit behavior, Providence waived arbitration. *Burton-Dixie Corp. v. Timothy McCarthy Construction Co.,* 436 F.2d 405, 408–09 (CA5 1971); *Cornell & Co. v. Barber & Ross Co.,* 123 U.S.App.D.C. 378, 360 F.2d 512 (1966).[40]

On remand the district court should find Manhattan's actual delay damages arising from Providence's mistakes on the sewage ejection and bedlight fixture problems.[41]

### B. *Claims against McCauley*

■ Manhattan's claims in this regard are similar to Ernst's. Manhattan's closer relationship to the architect makes an even more persuasive case for its inclusion within the scope of the risk created by the latter's actions. Manhattan may recover on remand for actual delay damages arising from McCauley's defective plans and specifications regarding the generator system (if such be found to constitute negligence) as well as the architect's procrastinations in ruling on Fairbanks' submittals for that system.

### C. *Claims against Ernst*

■ The district court was not clearly erroneous in finding that although it was "an extremely close question," 387 F.Supp. at 1028, Manhattan did not make out a case of fraud by Ernst regarding the generator submittals.

The court also found that Ernst knowingly installed the explosion-proof receptacles in an improper and hazardous manner and then concealed this danger by using longer screws. But the court did not rule on the question whether this action constituted fraud under Alabama law. Manhattan raised this issue throughout the trial,[42] and the district court should make appropriate findings and conclusions on remand.

Manhattan's claims for damages against Ernst on this receptacle matter are complicated by a subcontract provision[43] which the district court appears to have referred to in passing[44] but which we cannot find in the record. On remand the district court should make findings on the existence of, and conclusions on the interpretation of, this provision in the subcontract.

### D. *Claims against Fairbanks*

■ The district court found Fairbanks guilty by clear and convincing evidence of fraud in its representations concerning the generator's ability to comply with the specifications. It awarded Manhattan $20,000 in punitive damages for this fraud but did not grant compensatory damages, even though it found that "[t]he other parties did rely upon the misrepresentations with the result that the project was delayed and substantial losses were incurred." 387 F.Supp. at 1031. Alabama law allows recovery of compensatory damages in cases of statutory fraud. Ala.Code tit. 7, §§ 107 *et seq.* (1960

---

**40.** Manhattan is not barred by failing to obtain a "certificate of completion" pursuant to the general conditions. Its appeal is concerned not with obtaining final payment but rather with securing delay damages in addition to final payment. We note that McCauley did give Manhattan a "certificate of acceptance," dated June 21, 1972, accepting the building as complete in accordance with plans, specifications, and contract documents.

**41.** *See* part I, section E, *supra.*

**42.** Record on Appeal 1281. Our reading of the record does not reveal with certainty whether the district court ever ruled on this claim with finality. The court granted Ernst's motion to dismiss the claim on May 9, 1973, without opinion. *Id.* at 1366. But it would seem to be included within the scope of the pretrial order setting issues for trial, and it later became subject to various motions by Manhattan. *Id.* at 1625, 2064.

**43.** According to Ernst, this provision read:

Limit of liability for delay in completion on part of E. C. Ernst, Inc. shall be no greater than the penalty as set up in the Owner's contract.

Reply Brief for Ernst 40 n. **.

**44.** *See* 387 F.Supp. at 1004–05 (finding 3), 1009, 1033 (finding 128).

Recomp.); *Ringer v. First National Bank,* 291 Ala. 364, 281 So.2d 261 (1973). On remand, Manhattan is entitled to recover actual damages from Fairbanks if it can prove them.

### E. *Claim for prejudgment interest*

 Manhattan claims prejudgment interest on any damage award that it may receive. Alabama law governs any award of interest, regardless of the existence of 28 U.S.C. § 1961. *Degelos Bros. Grain Corp. v. Fireman's Fund Insurance Co.,* 498 F.2d 1238 (CA5 1974). In Alabama only liquidated claims generally justify prejudgment interest. *Grand Bay Land Co. v. Simpson,* 207 Ala. 303, 92 So. 789 (1922). The claims of Manhattan here are too uncertain in amount to qualify under any of the recognized exceptions to this rule. *Roe v. Baggett Transportation Co.,* 326 F.2d 298 (CA5 1963) (Alabama law); *accord, Belcher v. Birmingham Trust National Bank,* 488 F.2d 474 (CA5 1973).

### V. *Manhattan's liability for liquidated damages*

 Manhattan claims that the district court was clearly erroneous in finding that it failed to coordinate work, leading to liquidated damages for delay to Providence. The only claim worthy of discussion here is that a general "flattening out" of work occurred after the generator delays had set in. The district court recognized this problem, 387 F.Supp. at 1027, but apparently found it to be no excuse to a party whose responsibility as general contractor included eliminating the effect of such occurrences, and we agree.

### VI. *Providence's claims*

 We agree with the district court that Providence's claim for damages from Fairbanks' proven fraud could not withstand a motion to dismiss. Providence has proven no damages other than delay, and for this it already has been compensated by Fairbanks (through Manhattan). Providence now has a Caterpillar-driven generator in place of the Dorman-powered one

that never materialized. In addition, as noted above, the district court's refusal to find Ernst guilty of fraud in connection with the generator matter was not clearly erroneous.

### VII. *Summary*

1. Ernst may not recover from Manhattan, because of the "no damage" clause in their subcontract.

2. Ernst may not recover from Providence, since the Providence-Manhattan contract evidences an intention not to vest Ernst with third-party beneficiary rights.

3. The liquidated damages assessed against Fairbanks by the district court did not include delays caused by defective specifications for the emergency generator's engine housing. McCauley was properly assessed responsibility for this mistake.

4. Ernst may recover under a negligence theory for McCauley's procrastinations in rejecting the Fairbanks emergency generator units.

5. Ernst may recover under a negligence theory for McCauley's erroneous rejection of Palco bedlight fixtures and its defective plans and specifications if, on remand, the district court finds that these defects constitute negligence.

6. The district court's calculation of $61,626.12 as the indemnity due Ernst from Fairbanks for Ernst's upstream liability on the generator is correct.

7. Ernst may recover damages for delays caused by Fairbanks' breach of contract.

8. The district court's $20,000 award of punitive damages from Fairbanks to Manhattan was not an abuse of its discretion.

9. The district court's $20,000 award of punitive damages from Fairbanks to Ernst was not an abuse of its discretion. However, the court should reduce this figure on remand if it included some amount compensating Ernst for its attorney's fees.

10. Ernst may recover attorney's fees from Fairbanks based on their indemnity agreement. However, this recovery should

be limited to amounts expended on the generator litigation, excluding suit against Fairbanks itself.

11. The district court did not err in allowing apportioned liquidated damages to Providence.

12. The district court did not err in finding that Ernst was responsible for delay arising from its installation of the explosion-proof receptacles.

13. Manhattan may recover for its actual delay damages arising from Providence's mistakes on the sewage system and Palco bedlight fixture matters.

14. Like Ernst, Manhattan may recover under a negligence theory for McCauley's procrastination in rejecting the Fairbanks emergency generator units.

15. Like Ernst, Manhattan may recover under a negligence theory for McCauley's erroneous rejection of Palco bedlight fixtures and its defective plans and specifications if, on remand, the district court finds that these defects constitute negligence.

16. The district court did not err in rejecting Manhattan's and Providence's claims of fraud by Ernst in counseling Fairbanks on its generator submittals.

17. Manhattan's claim for actual delay damages from Ernst on the explosion-proof receptacles matter is remanded for further consideration concerning the existence and effect of a provision in their subcontract. The district court should also make an explicit finding regarding the existence of fraud on Ernst's part in connection with the installation of the receptacles.

18. Manhattan may recover compensatory damages for Fairbanks' fraud.

19. Manhattan may not recover prejudgment interest on any damage award that it may receive.

20. The district court did not err in assessing liquidated damages for delay against Manhattan for its failure to coordinate the work on the job site.

21. Providence has proven no damages for which it has not already been compensated with respect to Fairbanks' fraud.

22. On remand, Ernst and Manhattan's recoveries will be predicated on their ability to show fact, amount, and apportionment of damage with reasonable certainty.

The district court's judgment is AFFIRMED in part, VACATED, in part, and REMANDED for further proceedings not inconsistent with this opinion.